[Cite as *State v. Sims*, 2018-Ohio-769.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NOS. 2016-CA-46; |
| | : | 2016-CA-47 |
| v. | : | |
| | : | T.C. NOS. 2016-CR-148; |
| EDWARD LEE SIMS | : | 2015-CR-631 |
| | : | |
| Defendant-Appellant | : | (Criminal Appeal from |
| | : | Common Pleas Court) |

. . . . . . . . . . .

# **O P I N I O N**

Rendered on the 2nd day of March, 2018.

. . . . . . . . . . .

ANDREW PICKERING, Atty. Reg. No. 68770, 50 E. Columbia Street, 4th Floor, Springfield, Ohio 45501
        Attorney for Plaintiff-Appellee

FRANK BATZ, Atty. Reg. No. 93817, 126 N. Philadelphia Street, Dayton, Ohio 45403
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Edward Lee Sims appeals from his August 4, 2016 Judgment of Conviction, issued after a jury trial, on two counts of violating a protection order, in violation of R.C. 2919.27, both felonies of the fifth degree. Sims was sentenced to five years of

community control sanctions.   We hereby affirm the judgment of the trial court.

{¶ 2}   The record before us reflects that on April 27, 2017, this Court issued a Decision and Entry, after a review of the initial brief on direct appeal submitted by counsel for Sims pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).   This Court found arguably meritorious issues to present on appeal, and appointed new counsel to submit a non-*Anders* brief.

{¶ 3}   The record further reflects that Sims was indicted, on December 7, 2015, on one count of violating a protection order or consent decree, in Case No. 2015 CR 0631, and he plead not guilty on December 16, 2015.   He was released on bond, and the record reflects that Sims was arrested on March 17, 2016, for failure to appear for a final pretrial conference held on March 3, 2016.   A jury trial was scheduled for April 28, 2016.

{¶ 4} Sims was also indicted on March 28, 2016, in Case No. 2016 CR 0148, on two counts of violating a protection order or consent agreement, and he plead not guilty on April 7, 2016.   On April 13, 2016, the State filed in both cases a "Motion to Consolidate" Case No. 2016 CR 0148 with Case No. 2015 CR 0631, asserting that "case number 15-CR-0631 contains one count of Violating a protection Order, and case number 16-CR-0148 contains two counts of Violating a Protection Order.   Both cases involve the same female victim, Erin Beatty." Sims opposed the motion on April 15, 2016.

{¶ 5} On April 22, 2016, Sims filed a "Motion for Separation" of the two counts in the indictment in Case No. 2016 CR 0148, since "the allegations in count one occurred approximately 23 days after count 2."   On April 18, 2016, the court consolidated the cases. On April 25, 2016, the State filed a "Motion to Dismiss Count One of the Indictment," in Case No. 2016 CR 0148, and the court granted the motion on June 29,

2016.

**{¶ 6}** At trial, Paula Jones testified that she is the official records custodian for the Domestic Relations Division of the Clerk of Court for Clark County. She identified as State's Exhibit 1 an August 8, 2013 ex parte order of protection captioned Erin Gale Beatty versus Edward Lee Sims, Case No. 13-DP-0704. Jones identified Exhibit 2 as "the paperwork that was processed for the ex parte, and it's the sheriff's return" in Case No. 13-DP-0704. She identified Exhibit 3 as "a final order of protection" in Case No. 13-DP-0704, dated August 27, 2013. Jones testified that Exhibit 3 lists Beatty's address as 741 North Florence Street in Springfield. She stated that the order is effective until August 8, 2018, and that it indicates that Sims and Beatty were present at the final hearing on the petition. Jones stated that Exhibit 3 further reflects that it was served on Sims at 709 North Florence Street and in the care of the Clark County Jail via U.S. Mail. Jones testified that the file for Case No. 13-DP-0704 contains no returned mail.

**{¶ 7}** Ross Eubanks testified that he is a deputy at the Clark County Sheriff's Office. He stated that while assigned to the jail he served an ex parte protection order on Sims in the Clark County Jail on August 9, 2013. Eubanks identified Exhibit 2 as the personal service for the ex parte order bearing Eubanks' and Sims' signatures and reflecting service upon Sims. He stated that the jail uses a system known as "INTERSLam" that "keeps a record of all the inmates * * * that have been booked for approximately the last 10 years." Eubanks identified as Exhibit 4 a "Prison Booking Record" for Sims. He stated that it reflects that Sims was booked into the jail on August 19, 2013. Eubanks identified Exhibit 5 as a "continuation of the book-in form" which reflects that Sims was released from jail on September 12, 2013.

**{¶ 8}** Erin Beatty testified that she resides at 741 North Florence Street, in Springfield, with her two sons, and that she moved into the residence in November of 2012. She stated that Sims is her ex-boyfriend, and that they were in a relationship for two and a half years. Beatty stated that she has a current civil stalking protection order against Sims that she obtained in August of 2013 and is effective until August of 2018. Beatty stated that Sims was present at the final hearing on the order. According to Beatty, Sims has two prior convictions for violating the protection order.

**{¶ 9}** Beatty stated that on October 10, 2015, her sons "came in and let me know Edward was walking down the street." She stated that she went outside and observed Sims "walking down the street towards Lagonda with another gentleman. That's when I called 9-1-1. He had already passed two or three times by that time." According to Beatty, an officer responded to her home, and within five or ten minutes, Sims "was walking by again and that's when they picked him up at the residence on Cora Street."

**{¶ 10}** Beatty further stated that on March 17, 2016 she observed Sims "down at the end of the road" and again called the police. According to Beatty, "Officer Ivory came and the other officers were down there arresting him. Officer Ivory * * * actually physically measured how far down it was." Beatty identified Exhibit 3 as a copy of her protection order. She stated that it provides that Sims "is not allowed within 500 yards of me or my household or my children."

**{¶ 11}** On cross-examination, Beatty stated that she is "a recovering addict, so I was in active addiction for the majority of our relationship." She stated that she is a recovering alcoholic and had "a crack addiction." She testified that she has been "clean" for four and a half years with one relapse. She stated that she occasionally spent the

night where Sims resided, and that he occasionally stayed with her. She stated that when she first moved into her home, Sims resided with Tom and Mary Bunch on South Florence Street, which was a "fair distance" from her residence. Beatty stated that Sims did not move into 1570 Cora Street while they were in a relationship, and that he moved there after the protection order was in effect.

{¶ 12} Beatty stated that her protection order also required her to stay away from Sims. The following exchange occurred:

Q. Didn't always follow that order?

A. I never pursued him.

Q. You have never came over to Tom and Mary Bunch's and picked him up or - -

A. No.

* * *

Q. * * *Never met up with him, never had any contact with him without contacting the police?

A. Yes. As a recovering addict, I saw that he was going to McKinley Hall and trying to do better for himself. So I, in my recovery process at that time, I tried to have forgiveness and be helpful; but then a Little [sic] too late, too soon I realized that was a big mistake.

Q. But it's fair to say that at points in your relationship with Mr. Sims, you willfully violated that protection order.

A. Twice.

Q. Only twice?

A.   That I can recall, yes.

Q.   So it's possible it could be more, you just can't remember?

A.   No.   It wasn't more.

{¶ 13} Officer Kelly Chrisman testified that he is employed at the Springfield Police Division.   He stated that on the evening of October 10, 2015, he and Officer Jenkins were dispatched to 741 N. Florence Street, and that it was not yet dark outside.   Chrisman testified that he verified with the dispatch center that Beatty had a protection order.   He stated that he and Jenkins, after speaking with Beatty, "stood to the side of her house and basically observed the area and located the Defendant walk past her residence" within five or ten minutes.   Chrisman stated that he then made contact with Sims at 1570 Cora Street, where he was seated on the front porch, "which is just east of the victim's home.   At that point an arrest was made for the protection order violation."   He stated that the officers placed him in custody and transported him to jail.   On cross examination, Chrisman stated that Sims advised him that he resided at 1570 Cora Street.

{¶ 14} Sergeant Bret Bauer testified that he is the Traffic Unit supervisor for the Springfield Police Department.   He stated that he measured the distance between 1570 Cora Street and 741 North Florence Street from the front walk of each address with a "wheel."   He stated that the distance is 252 feet.

{¶ 15} Greg Ivory testified that he is an officer with the Springfield Police Department.   He stated that on March 17, 2016, while on routine patrol, he was dispatched to 709 North Florence Street because "Mr. Sims was standing down there at the other end of the privacy fence on the other side of 709 North Florence."   According to Ivory, "Officer Scott got there before I did.   On our way there, dispatch told us that he

had several outstanding warrants." Ivory testified that he and Scott "walked [Sims] over to Officer Scott's patrol car, searched him for weapons and contraband, and put Mr. Sims in the backseat; and at that point in time I walked down the street to speak to Ms. Beatty." Ivory stated that Beatty had a copy of her protection order, which required Sims to stay beyond 500 yards of her. According to Ivory, there "was a city water crew in the area marking the paint marking on the ground for the water lines in that neighborhood; and I asked them if they had a measuring wheel that we use for traffic crash investigation, and I borrowed their wheel and measured from the front gate of her address to the area right where we found Mr. Sims." He stated that distance was 467 feet, "which is well within the 500 yards as stated in the protection order." Ivory stated that Sims was apprehended for violating the protection order. On cross examination, Ivory testified that 709 North Florence Street is the address of Castle Hauling. He stated that there was a six-foot privacy fence between 741 North Florence Street and 709 N. Florence Street.

{¶ 16} Mary Bunch testified that when she met Sims, Beatty was his girlfriend, and she and Beatty became friends. Bunch stated that she last spoke with Beatty on Mother's Day of 2014. She stated that she became aware of Beatty's protection order in 2014. She testified that on Mother's Day she ran into Beatty at "Save a Lot" and advised her "not to stop by the house because Ed was there because of the protection order being in effect." She stated that Beatty "took it upon herself to come to the house knowing that Ed was physically staying there at the time, and they wound up leaving together." Bunch stated that at that time, she resided at 223 North Greenmont. She stated that Sims has worked for Castle Hauling "on and off for about seven years." On cross examination, Bunch testified that Sims spoke of the protection order and was aware of it.

{¶ 17} Thomas Bunch testified that he resides at 223 North Greenmont, and that he met Sims "about 10 years ago at Ray Castle's Hauling and Removal, a little junk yard." He stated that Sims is a friend, and that he met Beatty six or seven years ago. Bunch stated that Sims told him about the protection order. Bunch stated that after he became aware of the protection order, he observed Sims and Beatty together at least three times. He stated that one time he observed Sims coming out of "Whitacre's" when "Erin stopped him." Bunch stated that on two other occasions, Beatty picked Sims up in front of Bunch's home and took him to pay his cell phone bill and brought him back. He stated that Beatty came to his home for Sims two years ago, "right after Ed had gotten out of jail the first time."

{¶ 18} Roger Jenkins testified that he is a police officer for the City of Springfield. He stated that he was dispatched to 741 North Florence Street on October 10, 2015 on "a possible protection order violation." He stated that after speaking to Beatty, he and Officer Chrisman moved their cruisers to an alley behind her home and "stood between two houses." He stated that it was getting dark when they observed "a gentleman that matched the description on the corner across the street, at the corner of Cora and Florence." Jenkins stated that he and Chrisman followed the suspect, who turned out to be Sims, to his front porch at 1570 Cora Street. Jenkins stated that Beatty had a copy of the protection order at her home, and that they verified that the protection order had been served. He stated that Sims was taken into custody.

{¶ 19} At the conclusion of Jenkins' testimony, the State rested, and counsel for Sims moved for an acquittal. The court overruled the motion.

{¶ 20} Richard Diego Saunders testified that he resides at 1570 Cora Street in

Springfield with Sims. According to Saunders, Sims has resided with him for at least two years. Saunders testified that he was aware of the protection order, and that he has seen Sims and Beatty together two or three times. He stated that he recently saw them together last February of 2016, in Beatty's car, coming down Cora Street. Saunders testified that Castle Hauling is straight down the street from Beatty's residence, and that in December of 2015, he observed Beatty approach Sims there. Saunders testified that Sims has been employed at Castle for 10 years or more. On cross examination, Saunders testified that from his front porch he can clearly see the front of Beatty's house. He stated that when he learned of the protection order, he and Sims discussed it and he told Sims to "go down through the alley or go down the train track and come up and down." Saunders testified that Beatty drives a Buick La Sabre with a loud muffler, and that he has seen her driving past his home.

{¶ 21} Sims testified that he is 62 years old, and that he has lived with Saunders for about two years. He stated that prior to residing with Saunders, he lived with the Bunches on North Greenmont. He stated that he works at Castle Hauling, 709 North Florence Street, having done so for over 12 years. Sims stated that he met Beatty in 2010. He stated that at the time, Beatty was using crack, "but at that time I didn't care nothing about her. We just had fun." He stated that "one day she came to me and she was, like, wanted to put herself in this program, 90-day program so that she can stop, get off of drugs and * * * get her kids back. So she asked me would I support her and I did, twice." He stated that in 2011, he "started seeing her in a different light." At the time, according to Sims, he "might have been living at 709 North Florence 'cause I lived there too. If you look at that protection order, you see that that's my address." Sims stated

that he "lived in the back in the lean-to and that's all in the protection order.   That's my address."

**{¶ 22}** Sims stated that Beatty completed the program, "got out, and maybe about a month later she relapsed and, * * * she went off in the streets again."   He stated that he lived with Beatty at 741 Florence Street when she first moved there in 2012 for about a year. Sims stated that his relationship with Beatty was off and on.

**{¶ 23}** The following exchange occurred:

Q. * * * So, again, you were aware that you couldn't be within 500 yards of Erin; is that right?

A.   I thought it was 500 feet.

Q.   But you know that there was some prescribed distance that you couldn't be near her.   Is that right?

A.   Yes, sir, but I was allowed to be at work.

Q.   Okay.

A.   I was allowed - - I was on probation with an ankle monitor with GSP [sic].   I was allowed to be at work because it was a mailing address, where I worked and where I lived and I was on misdemeanor probation; and I still was allowed to be at work as long as I didn't contact her; and this time I haven't contact her.   Everyone testified at this trial that I haven't been in contact with her in over a year.

Q. * * * Was there ever a time where you, after that protection order was issued, that you and her got together again?

A.   Oh, yes, plenty of times.

Q.   About how many times do you think?

A.   It's been a lot.   You know, only problem we ever had is when she relapsed and we argued. * * * I know when she relapse what she would do.   She would sell her body for the drugs.

* * *

Q.   When was the last time that she got mad and that was the end?

A.   Well, I haven't had contact.   I'm gonna tell you exactly when it was.    It was April 10, 2015.   It's been over a year that I had any contact with her.

{¶ 24}   Regarding the events of October 10, 2015, Sims testified that he went to a friend's home and then returned to his residence without contacting Beatty.   He stated, "the protection order can't force you out of your home.   That's how I was feeling; and as long as I didn't contact her and, you know, that's where I live and I'm just on my way home."   Sims testified that he was at work on March 17, 2016 at 709 North Florence Street when he was arrested.   He testified as follows:   "We were at the picnic table on break.   The picnic table is at the six-foot privacy fence like the officer was talking about.   It was impossible for her to see me and so she's lying when she said that she looked down the street and saw me.   She couldn't have."

{¶ 25} When asked why he continued to reside at 1570 Cora Street while the protection order was in effect, Sims responded that he has "nowhere else to live and I lived there, and I figure, like, as long as I don't contact her in the protection order, I want to know if you can show me in that protection order where it says that I would have to leave my home.   It does not say that anywhere in it."   According to Sims, "Judge put me

on probation and he allowed me to go to work."

{¶ 26} On cross examination, Sims identified two judgment entries of conviction, dated January 17, 2014 and July 1, 2015, reflecting Sims' convictions, following guilty pleas, for violating the final protection order. Sims stated that he was present at the final hearing on the protection order, and that he resided at 709 North Florence Street at the time. Sims acknowledged that paragraph five of the protection order provides that he shall not be within 500 yards of Beatty, and that he knew where Beatty lived. When asked if the protection order provides any exceptions for his residence or place of employment, Sims responded, "Also nothing in the protection order that says you can put me out of my home or from where I work." The following exchange occurred:

Q. * * * Since moving into 1570 - - how long have you been at 1570 Cora Street?

A. Over two years.

Q. * * * That's after that protection order was granted. Is that right?

A. Right.

Q. And you were aware that that was within the 500 * * * yards of her home. Is that right?

A. Yes.

Q. * * * At any point in time did you apply to the Court to amend that order allowing you to live at 1570 Cora Street?

A. Well, no, I didn't have time to do that.

* * *

Q. Mr. Sims, just for clarification for you, I'm handing you what's

been marked as State's Exhibit 1. Are you talking about State's Exhibit 1 and that's where 709 North Florence Street is?

A. I always lived in that neighborhood and I lived at 709.

Q. * * * Well there's two things there. So that was in the ex-parte order. Is that right? That's what State's Exhibit 1 is, the ex-parte order?

A. I guess.

Q. And then there was a final hearing and that's where State's Exhibit 3 came from, the final order. Is that right? And you were there. Is that right?

* * *

A. Yes.

Q. So with that knowledge, the Court's knowledge that you were putting on the ex-parte order where you lived, this final order was still granted. Is that right?

A. Yeah, I didn't contest it.

* * *

Q. Even though you know that 709 North Florence Street is just down the street from 741 North Florence Street. Right?

A. Yes, ma'am. And I told you that the Judge - - I was on probation and I had an ankle monitor with GPS and was allowed to keep my job and was allowed to go to work.

* * *

Q. You're bringing up a situation that I don't know anything about,

to be honest with you.

A. Well, all you have to do is look it up. It was in my files. I was on probation and I was allowed to go to work and that was the statement that come from the Judge in the paper, in black and white.

{¶ 27} On redirect examination, the following exchange occurred:

Q. So when were you put on probation that said that you were allowed to keep your job?

A. It was like my first violation. When I violated it, it was a misdemeanor and we went in front of Judge Nevius. We was like arguing and stuff, still mad at one another, and I made a phone call to her. I told you I violated. I paid for it.

Q. What year was that? Do you remember, Mr. Sims?

A. I believe 2013.

* * *

Q. But, again, just so I want to make sure that the jury understands is that you thought that as long as you lived in the neighborhood or worked in that neighborhood and you didn't try to contact Ms. Beatty, you were not in violation of that protection order.

A. Yes, sir.

{¶ 28} At the conclusion of Sims' testimony, the prosecutor asked for a brief recess to "look into the accusations that the Defendant just testified to. * * * he's saying that a Judge allowed him to work there, and I would like the opportunity to look into that." After the recess, defense counsel indicated that "the State is not going to present a rebuttal

case."

**{¶ 29}** On June 30, 2016, the jury found Sims guilty of each count, and further found that Sims "was previously convicted of Violation of a Protection Order."

**{¶ 30}** Sims asserts three assignments of error herein. For ease of analysis, we will consider his third assignment of error first. It is as follows:

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ADMITTING EVIDENCE OF THE APPELANT'S PRIOR BAD ACTS IN VIOLATION OF OHIO RULE OF EVIDENCE 404(B).

**{¶ 31}** Sims asserts that he "objected to the admission of the Appellant's prior bad acts on multiple occasions." He asserts that the "State argued that evidence of the Appellant's prior bad acts was admissible because they would introduce it in a limited fashion to show that the prior convictions related to the same protection order and the same victim." Sims argues that generally, "evidence of a defendant's prior bad acts is considered inadmissible hearsay evidence relating to character." He asserts that the "State used evidence of the Appellant's prior bad acts to show that he has the propensity to commit the crime charged, as in the past the Appellant has committed the same crime against the same victim."

**{¶ 32}** " 'The admission or exclusion of relevant evidence rests within the sound discretion of the trial court.' * * * A trial court abuses its discretion when it make a decision that is unreasonable, arbitrary, or unconscionable. *State v. Renner,* 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 24." *State v. Williams*, 2d Dist. Montgomery No. 26369, 2016-Ohio-322, ¶ 17. "The Supreme Court of Ohio has defined 'abuse of discretion' as an 'unreasonable, arbitrary, or unconscionable use of discretion, or as a

view or action that no conscientious judge could honestly have taken.' *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 67." *Williams, id.*

**{¶ 33}** Each count in Sims' indictments in Case Nos. 2015 CR 0631 and 2016 CR 0148 provides that Sims:

* * * did recklessly violate the terms of a protection order issued pursuant to Section 2903.214 of the Revised Code, and the said EDWARD LEE SIMS having previously been convicted of or pleaded guilty to a Violation of Protection Order in the Clark County Common Pleas Court Case Numbers 13CR0752 and 15CR0184, in violation of Section 2919.27(A)(2) of the Revised Code and against the peace and dignity of the State of Ohio.

**{¶ 34}** As it existed at the time of Sims' offenses, R.C. 2919.27 provided:

(B)(1) Whoever violates this section is guilty of violating a protection order.

(2) Except as otherwise provided in division (B)(3) or (4) of this section, violating a protection order is a misdemeanor of the first degree.

(3) If the offender previously has been convicted of, pleaded guilty to, or been adjudicated a delinquent child for a violation of a protection order issued pursuant to section 2151.34, 2903.213, or 2903.214 of the Revised Code, * * * violating a protection order is a felony of the fifth degree.

**{¶ 35}** "The Supreme Court of Ohio has held that: 'When existence of a prior conviction does not simply enhance the penalty but transforms the crime itself by increasing its degree, the prior conviction is an essential element of the crime and must

be proved by the State.' *State v. Brooke*, 113 Ohio St.3d 199, 863 N.E.2d 1024, 2007-Ohio-1533, ¶ 8." *State v. Vance*, 2d Dist. Clark Nos. 09-CA-115, 09-CA-116, 2010-Ohio-5757, ¶ 17.

**{¶ 36}** In addition to a prior conviction being an element of Sims' offenses that the State had to prove, the trial court properly admitted Sims' prior convictions as evidence of his knowledge of the protection order and the absence of mistake or accident. Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

**{¶ 37}** Finally, we note that the trial court instructed the jury as follows:

Evidence was received about the commission of a crime or crimes other than the offenses with which the Defendant is charged in this trial. That evidence was received only for a limited purpose. *It was not received and you may not consider it to prove the character of the Defendant in order to show that he acted in conformity with that character.* If you find that the evidence of other crime or crimes is true and that the Defendant was convicted of that crime or crimes, you may consider that evidence only for the following purposes:

One, in deciding whether it proves the elements of the prior conviction necessary for the enhancement of the offense.

Two, in deciding whether it proves absence of mistake or accident or knowledge of circumstances surrounding the offenses charged in this trial.

Three, for the purpose of helping you test the credibility or weight to give his testimony. The evidence cannot be considered for any other purpose.

**{¶ 38}** The jury was specifically instructed not to consider Sims' prior convictions as evidence that he has a propensity or inclination to violate the protection order, and "[t]he jury is presumed to follow instructions it is given." *State v. Owings*, 2d Dist. Montgomery No. 21429, 2006-Ohio-4281, ¶ 77.

**{¶ 39}** Since an abuse of discretion is not demonstrated, Sims' third assignment of error is overruled.

**{¶ 40}** We will consider Sims' first and second assignments of error together. They are as follows:

APPELLANT'S CONVICTION WAS BASED ON INSUFFICIENT EVIDENCE AS A MATTER OF LAW,

And,

APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 41}** According to Sims, the State "failed to prove beyond a reasonable doubt that the Appellant 'recklessly' violated the terms of the protection or that the order was ever formally served." According to Sims, while he "clearly violated the terms of the protection order, he was acting under the impression that the court allowed him to work and access his home without creating a protection order violation." The State responds that it "was not required to prove that Defendant actually made contact with Ms. Beatty in order to prove recklessness." The State further asserts that Sims was properly served

with the final order of protection via U.S. Mail.

{¶ 42} As this Court has previously noted:

"A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson,* 2d Dist. Montgomery No. 22581, 2009–Ohio–525, ¶ 10, citing *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis,* 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether,

in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

*State v. Hill*, 2d Dist. Montgomery No. 26581, 2015-Ohio- 5166, ¶ 25-27.

**{¶ 43}** We will first address Sims' assertion that the State failed to prove that he was properly served with the final protection order. As the State asserts, "[t]o sustain a conviction for a violation of a protection order pursuant to R.C. 2919.27(A)(2), the state must establish, beyond a reasonable doubt, that it served the defendant with the order before the alleged violation." *State v. Smith*, 136 Ohio St.3d 1, 2013-Ohio-1698, 989 N.E.2d 972, at syllabus. Sims' argument fails for two reasons. First, Sims is raising the issue of service of the final protection order for the first time in this appeal, and he has twice been convicted, following guilty pleas, of violating the same protection order before the violations occurred on October 10, 2015 and March 17, 2016. We conclude that he

has waived his right to challenge service of the final protection order.

{¶ 44} We further note that Civ.R. 65.1(C) governs service of civil stalking protection orders and provides:

(1) *Service by Clerk.* The clerk shall cause service to be made of a copy of the petition, and all other documents required by the applicable protection order statute to be served on the Respondent * * *.

(2) *Initial Service.* Initial service, and service of any ex parte protection order that is entered, shall be made in accordance with the provisions for personal service of process within the state under Civ.R. 4.1(B) or outside the state under Civ.R. 4.3(B)(2). Upon failure of such personal service, or in addition to such personal service, service may be made in accordance with any applicable provision of Civ.R. 4 through Civ.R. 4.6.

(3) *Subsequent Service.* After service has been made in accordance with division (C)(2) of this rule, any additional service required to be made during the course of the proceedings on Respondent, * * * shall be made in accordance with the provisions of Civ.R. 5(B).

{¶ 45} Civ.R. 5(B)(2) provides: "A document is served under this rule by: * * * (c) mailing it to the person's last known address by United States mail, in which event service is complete upon mailing."   Eubanks testified that he served Sims with the ex parte order personally, and Jones testified, and the final order reflects, that it was sent to Sims in care of the Clark County Jail, and to 709 N. Florence Street, which Sims testified was his mailing address, via U.S. mail.   The final order reflects that it was journalized on August

27, 2013, during the time that Eubanks testified Sims was in the Clark County Jail.

{¶ 46} Regarding Sims' assertion that the State failed to prove that he acted recklessly, we disagree.   R.C. 2919.27(A)(2) provides: "No person shall recklessly violate the terms of * * * [a] protection order issued pursuant to section * * * 2903.214 of the Revised Code."   R.C. 2901.22(C) provides:

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶ 47} The protection order provides in part:

5.   **RESPONDENT SHALL STAY AWAY FROM PETITIONER** and all other protected persons named in this order, shall not be present within 500 yards * * *  of protected persons, wherever protected persons may be found, or any place the Respondent knows or should know the protected persons are likely to be, **even with Petitioner's permission**.   If Respondent accidentally comes in contact with protected persons in any public or private place, Respondent must depart *immediately*.   This order includes encounters on public and private roads, highways, and thoroughfares.

{¶ 48} Having been twice convicted of violating the same protection order, Sims'

argument that he believed himself not to be in violation thereof while working at Castle Hauling and residing at 1570 Cora Street, defies logic. Sergeant Bauer testified that the distance between Beatty's residence and 1570 Cora Street was 252 feet, and Ivory testified that the distance between Castle Hauling and Beatty's residence is 467 feet. Sims clearly knew where Beatty resided, having lived there with her in the past. While Sims, the Bunches and Saunders testified that Beatty routinely permitted contact with Sims, the protection order is clear that her permission is of no effect, and as the State asserts, it was not required to prove that Sims initiated contact with Beatty.

{¶ 49} Regarding Sims' assertion that he was permitted by the municipal court judge to live or work within 500 yards of Beatty, no such exception appears in the protection order, and Sims did not present any evidence, other than his own testimony, of the truth of his assertion. As this Court has noted, " '[a] jury, as finder of fact, may believe all, part, or none of a witness's testimony,' " and the jury was entitled to disbelieve Sims' testimony on this issue. *State v. Flores-Lopez*, 2017-Ohio-690, 85 N.E.3d 534, ¶ 63 (2d Dist.). Further, only the court of common pleas has jurisdiction over proceedings for protection orders. R.C. 2903.214; R.C. 1901.18(A)(9) (listing protection orders over which municipal courts have jurisdiction; R.C. 2903.214 not included). Finally, Form 10.03-H, which is part of the final order of protection, provides: "Only the Court can change this Order. * * * You act at your own risk if you disregard this WARNING. If you want to change the Order you must ask the Court." When asked if he ever applied to the court to amend the order, Sims replied, "I didn't have time to do that."

{¶ 50} For the foregoing reasons, we conclude that a rational finder of fact, after viewing the evidence in a light most favorable to the State, could find that Sims, with

heedless indifference to the consequences, disregarded a substantial risk that his conduct in working and living within 500 yards of Beatty was likely to result in a violation of the protection order. Further, having reviewed the entire record, we cannot conclude that the trier of fact clearly lost its way and created a manifest miscarriage of justice. The jury clearly credited the testimony of the State's witnesses over Sims and his witnesses, and we defer to the jury's assessment of credibility. Having concluded that Sims' convictions are supported by sufficient evidence and not against the manifest weight of the evidence, his first and second assignments of error are overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies mailed to:

Andrew Pickering
Frank Batz
Hon. Richard J. O'Neill