[Cite as *State v. Diebert*, 2025-Ohio-2620.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                          Court of Appeals No. WD-24-062

    Appellee                                          Trial Court No. 24CRB0153

v.

Michael Allen Diebert                          **DECISION AND JUDGMENT**

    Appellant

Decided: July 25, 2025

* * * * *

Karin L. Coble, for appellant.

Alyssa M. Blackburn, Prosecuting Attorney for appellee.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, Michael Diebert, appeals from the August 6, 2024 judgment of the Bowling Green Municipal Court convicting him of violating a protection order. For the following reasons, the trial court's judgment is affirmed.

## I. Background

{¶ 2} On October 25, 2023, the Wood County Common Pleas Court issued a civil stalking protection order (CSPO) pursuant to R.C. 2903.214 prohibiting Diebert from coming within 500 feet of T.K. or his wife, P.K. The order further required that if Diebert "accidentally comes in contact with [T.K. or P.K.] in any public or private place, [Diebert] must depart *immediately*." (Emphasis in original.) Notably, the CSPO expressly included "encounters on public and private roads, highways, and thoroughfares." The order was effective until April 25, 2024.

{¶ 3} On August 6, 2024, Diebert was tried for recklessly violating the CSPO in violation of R.C. 2919.27(A), a first-degree misdemeanor, during an encounter that occurred on November 25, 2023, a month after the CSPO was issued. The encounter occurred near a pedestrian bridge located on East Water Street in North Baltimore, approximately 500 feet west of Diebert's home, that spans over a small creek. At the trial, the following testimony and evidence was presented.

{¶ 4} T.K. testified that he was an 81-year-old resident of North Baltimore, Ohio, a small town. He and his wife, P.K., frequently feed approximately 30 stray cats that live around North Baltimore. T.K. and P.K. learned that some cats had been abandoned in an area near the pedestrian bridge on East Water Street, so they began to leave cat food near the bridge. T.K. testified that they had been feeding the cats near the bridge for approximately one month before November 25, 2023.

2.

{¶ 5} On November 25, 2023, T.K. and P.K. were driving eastbound on Water Street, intending to leave food for the cats on the west side of the pedestrian bridge. As they approached the bridge, they saw a man walking eastbound along Water Street, also toward the bridge. They did not know who he was at first because they initially saw only the back of the man. As they neared the bridge, however, they passed the man and he looked toward their vehicle. They realized the man was Diebert. T.K. said he was unsure whether Diebert recognized them, but he observed Diebert begin recording video of their vehicle, which he thought meant that Diebert must have recognized them. T.K. testified that Diebert did not speak to them or make any gestures as he passed their vehicle.

{¶ 6} After they parked next to the bridge, T.K. and P.K. decided not to get out of their vehicle right away, and instead they waited for Diebert to cross the bridge and leave. T.K. testified that because they had a CSPO, they expected Diebert to leave the area right away and not "dillydally." T.K. said that Diebert did not leave right away, but instead Diebert went to one side of the bridge "and pointed something, looked over his shoulder and pointed something towards us and stood there for a few minutes." Diebert then crossed the bridge and did the same thing on the other side of the bridge before walking away. T.K. testified that he was not sure if Diebert was pointing a gun at them, so T.K. and P.K. waited inside their vehicle until Diebert "was well on his way" back to his house before they got out to feed the cats.

{¶ 7} The state played a video that Diebert recorded with his cell phone as he was walking along East Water Street toward the bridge that day. In the video, concrete

3.

barricades are visible where the bridge meets East Water Street on both sides to prevent vehicles from driving onto the bridge.  In the beginning of the video, a brown Toyota SUV with an Ohio license plate beginning with DY9 passes Diebert on his right side as he walks toward the bridge.  The vehicle stops just before the barricade, about 10 seconds after the video starts.  Diebert continues walking on the left side of the street, passing the stopped SUV without speaking or changing his pace, for approximately 20 seconds before he reaches the barricades.  He then steps around the barricades onto the bridge.  Once he gets onto the bridge, he stops and raises his binoculars and looks toward the creek on the north side of the bridge for approximately 10 seconds.  During those seconds, Diebert's camera is facing away from the SUV.  He then turns around and walks to the other side of the bridge, which takes him approximately 15 to 20 seconds, raises his binoculars again, and looks toward the south side of the creek for approximately 15 seconds.  During those 15 seconds, Diebert's camera records the parked SUV.  Diebert then continues on his path, exiting the bridge and walking away from the SUV as he points his camera over his left shoulder, recording the view behind him.  In total, Diebert's two stops to look over the two sides of the bridge with his binoculars appear to have delayed his path over the bridge by no more than 45 seconds.

{¶ 8} About 15 seconds after Diebert exits the bridge, a person is seen getting out of the driver's side of the SUV and waving at Diebert.  Diebert pauses for approximately 10 seconds as the person walks around the front of the SUV to the south side of the street, near the creek, and is then followed by a second person.  Diebert then resumes walking

4.

along the street without pausing or otherwise changing his pace while continuing to record video over his shoulder.  At no point during the entire video, which is just over 3 minutes long, is anyone heard speaking.

{¶ 9} T.K., on cross-examination, admitted that he did not contact the police about his encounter with Diebert until more than two weeks after it occurred because he had not realized that Diebert's actions could be a violation of the CSPO.  T.K. also confirmed that he told the police that Diebert stopped on the bridge for five to ten minutes, which T.K. conceded was not true.  T.K. explained that it just felt that long while he was waiting in his vehicle for Diebert to leave the bridge.  T.K. also admitted that when he reported Diebert's actions to the police, he did not tell the police that he thought Diebert might have had a gun, and instead he told the police that Diebert pointed a camera at them.

{¶ 10} Officer Brad McBride, a police officer with the North Baltimore police department, also testified.  Through a search warrant, Officer McBride obtained a video from a home security camera mounted on the exterior of Diebert's home.  The camera pointed down East Water Street toward the west, in the direction of the bridge.  Unlike Diebert's cell phone recording, this video did not have any audio.

{¶ 11} The security video is largely similar to Diebert's cell phone video, though the security video has a few details not present in the cell phone video.  The security video shows Diebert walking with a cell phone at just above shoulder height as he walks away from the bridge.  Upon reaching his property, Diebert spends a short time looking at an object on a tree, then walks toward his home and out of the camera view,

5.

approximately five minutes into the video. Diebert is never again visible in the video, and about five minutes after Diebert disappears from view, the SUV is seen turning around and driving away.

{¶ 12} Officer McBride testified that police also found a log in which Diebert recorded entries of the dates and times when Diebert observed either T.K.'s or P.K's vehicles near his home, including instances in which they were parked at a neighbor's house, at the bridge, or just driving past Diebert's home. Diebert also included a description of the vehicle in each entry. Officer McBride testified that there were 16 different entries in the log in which Diebert had recorded that he had observed T.K. or P.K. driving the same vehicle as the one that they drove in the video from November 25, 2023.

{¶ 13} On cross-examination, however, Officer McBride confirmed that his police report about the November 25, 2023 encounter states that T.K. and P.K. were driving a gray SUV with a license plate beginning with DLB, which Officer McBride also confirmed matched the vehicle listed 16 times in Diebert's logs. Though Officer McBride initially maintained that the gray SUV with the license plate beginning with DLB was the same vehicle as in Diebert's cell phone video, after viewing the cell phone video for a second time while on the stand, he admitted that the SUV in the video had a different license plate than the one in his police report. Instead of a license plate beginning with the letters DLB, which was the license plate number in Officer McBride's report, the license plate for the vehicle in the video began with DY8. Nonetheless,

6.

Officer McBride maintained that he had run a registration check on the license plate beginning with DY8, and the registration showed a Toyota registered to T.K. and P.K., though he did not clarify whether the registration indicated that the vehicle was brown, as it appears in the video, or dark gray as in the police report, testifying only that the registration was for a "dark colored" vehicle.

{¶ 14} Officer McBride also testified that the protection order did not prohibit Diebert from recording video, nor did it require Diebert to leave his home if T.K. or P.K. came within 500 feet of it. Officer McBride also said that the requirement to leave "immediately" may impose different requirements depending on the circumstances.

{¶ 15} Following Officer McBride's testimony, the state rested and Diebert moved for acquittal pursuant to Civ.R. 29. The trial court denied the motion.

{¶ 16} Diebert then testified. He testified that he was 67 years old, retired, and he takes walks once or twice a day because he had two knee replacements and a hip replacement. Diebert said he prefers to head west of his house to walk along East Water Street because the bridge is closed to vehicular traffic, making that route safer than others. On November 25, 2023, Diebert went for a walk, bringing with him his binoculars to observe wildlife as well as his cell phone. Diebert testified that he records videos whenever he "goes out anymore … to protect [him]self" from false accusations.

{¶ 17} As he was walking westbound, he noticed cat food on the ground near the bridge, so he thought that T.K. and P.K. had already fed the cats that day. Diebert took a

7.

photo of the cat food, and the photo, which appears to show cat food lying in a gravel area next to trees and other vegetation, was admitted into evidence.

{¶ 18} After crossing the bridge and walking for a while, Diebert turned around and headed eastbound, back toward his house. As he neared the bridge, he heard a vehicle approaching him from behind, so he turned his cell phone camera on. As the vehicle passed, he noticed that the vehicle was "chocolatey-brown" and he did not recognize the license plate number, so he turned his cell phone camera around to record the license plate. Diebert denied that he had ever seen P.K. or T.K. in that vehicle. He explained that in the past, he had always seen P.K. driving a gray SUV with a different license plate number—the same one as in the police report—and T.K. driving a blue Jeep. Diebert also maintained he did not look at the car, and instead he turned his camera around to record the license plate.

{¶ 19} Diebert continued walking until he got onto the bridge, which is when he stopped to look through his binoculars at wildlife near the creek on either side of the bridge. Diebert left the bridge and continued on his path home. He paused a third time at the intersection near Harrison Street, again to inspect the tree line near the creek for wildlife, which is when he saw a woman get out of the vehicle and wave at him. Diebert recognized the woman as P.K., and that is when he finally realized the people in the SUV were T.K. and P.K. Diebert then continued walking to his property, where he stopped at the tree to inspect a squirrel feeder.

8.

{¶ 20} After deliberations, the jury found Diebert guilty of violating the protection order. His sentence included a fine that was reduced in half upon Diebert's completion of anger management classes; an order prohibiting him from contact with the victims; a 180-day prison sentence, which the court suspended; and five years of community control. This appeal followed.

## II. Assignment of Error

{¶ 21} Diebert asserts the following assignments of error for review:

1. The verdict was unsupported by sufficient evidence and was therefore a violation of Due Process as guaranteed by the 5th and 14th Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution.

2. The conviction was against the manifest weight of the evidence.

## III. Law and Analysis

{¶ 22} Diebert's two assignments of error challenge the sufficiency of the evidence to support the verdict and the weight of the evidence to support his conviction. "Insufficiency and manifest weight are distinct legal theories." *State v. Fenderson*, 2022-Ohio-1973, ¶ 73 (6th Dist.). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 23} In contrast, when reviewing a manifest weight claim,

9.

> [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

*Id*., quoting *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 24} Diebert was convicted of violating R.C. 2919.27(A)(2), which provides that "[n]o person shall recklessly violate the terms of . . . [a] protection order issued pursuant to section . . . 2903.214 of the Revised Code." The statutory definition of "recklessly" is as follows:

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

R.C. 2901.22(C). Accordingly, the state needed to present evidence that Diebert disregarded a substantial and unjustifiable risk with heedless indifference to the consequences in violating the CSPO. Here, the state alleged that Diebert violated the CSPO by failing to depart immediately after he came into contact with P.K. and T.K., and therefore the issue on appeal is whether the state met its burden to demonstrate that Diebert's conduct on the bridge constituted a disregard for a substantial and unjustifiable risk with heedless indifference to the consequences.

10.

{¶ 25} Diebert argues that the verdict was not supported by sufficient evidence because he did not initiate the encounter, and when P.K. and T.K. drove near him, he acted reasonably by continuing to walk home. Diebert further contends he was not reckless in "pausing" a few times while walking home because his pauses lasted only seconds. Diebert claims that his actions fall far short of the actions of others whose convictions for violating a protection order were affirmed.

{¶ 26} The state responds that Diebert's actions were reckless because he disregarded a substantial and unjustifiable risk that he was violating the CSPO. In support, the state alleges "Diebert looked into [the] victims' car when he walked past, proceeded to the bridge, and instead of continuing home, he stopped on the bridge and looked around for several minutes[,] … all … while recording the victims." The state also contends that a protection order may be violated even without a verbal or lengthy encounter.

{¶ 27} In reply, Diebert alleges that the purpose of a CSPO is to prevent intimidation, harassment, or mental distress, and he maintains that he engaged in no threatening conduct in his encounter with T.K. and P.K. and they were not intimidated, as evidenced by P.K.'s wave to him that day and their delay in recognizing a violation may have occurred. He also points out that P.K. and T.K. approached the bridge after he was already walking in that direction, and the only way for Diebert to get home and thus depart the area was to cross the bridge, which he did on his own without any prompting. Diebert contends that the length of time he paused on the bridge is essential in

11.

determining whether his actions were reckless, and a delay of less than a minute cannot be reckless.

{¶ 28} What constitutes recklessness in failing to "immediately" depart is fact specific and varies depending on the surrounding circumstances. For example, a conviction for violating a protection order was affirmed where the appellant encountered the protected person at a gas station store and remained in his vehicle in the parking lot for "possibly as long as five minutes before leaving." *N. Olmsted v. Rieck*, 2011-Ohio-1557, ¶ 18 (8th Dist.). In another case, the appellant attended his grandchild's birthday party and remained there for 10 minutes after he became aware that the protected person was also at the party. *State v. Mays*, 2023-Ohio-1908, ¶ 37 (6th Dist.). And in another case, the appellant encountered a protected person in the park, made eye contact with the person, and then remained there for five minutes until two police officers happened by. *Lyndhurst v. Smith*, 2015-Ohio-303, ¶ 52 (8th Dist.). Accordingly, even a short delay in leaving the protected person's presence is sufficient to constitute a violation.

{¶ 29} Here, the state presented evidence that Diebert knew that T.K. and P.K. were in the SUV. P.K. and T.K. had been regularly feeding cats near a pedestrian bridge closed to vehicular traffic for about a month before the incident on November 25, 2023. Not only was Diebert aware of that practice, but he kept a log and other documentation, including photos, of P.K. and T.K.'s movements. T.K. also testified that Diebert looked inside the vehicle as he walked past it, additional circumstantial evidence to support that Diebert knew that P.K. and T.K. were in the vehicle. The state also presented evidence

12.

that Diebert "paused" multiple times on his walk home to look at wildlife with his binoculars, a recreational activity that he began only after he became aware that P.K. and T.K. were inside the vehicle and that was unnecessary to complete his journey home. Given this evidence, the jury could have found that Diebert was reckless in failing to immediately depart.

{¶ 30} Further, contrary to Diebert's arguments, the state did not need to establish that T.K. and P.K. felt intimidated, were harassed, or experienced mental distress to prove that he recklessly violated a CSPO.[1]  *See* R.C. 2919.27(A).  Indeed, "[i]t is not an element of R.C. 2919.27(A)(1) that individuals protected by a protection order feel fear when a defendant violates the order."  *State v. Estep*, 2022-Ohio-245, ¶ 24 (12th Dist.), citing *State v. Thacker*, 2020-Ohio-1318, ¶ 65 (12th Dist.); *see also Toledo v. Lear*, 2018-Ohio-1874, ¶ 15 (6th Dist.) ("R.C. 2919.27(A) can be violated without causing or threatening to cause harm to the victim.").  Neither did the state need to establish that Diebert initiated the encounter.  *See State v. Sims*, 2018-Ohio-769, ¶ 48 (2d Dist.).  Instead, the state only had to present evidence that Diebert "disregarded a known risk that his conduct was likely to place him …within 500 feet of [P.K. and T.K.]."  *State v. Tarver,* 2012-Ohio-4335, ¶ 58 (11th Dist.).  Because the state presented evidence from

---

[1] Moreover, the terms of the CSPO are not at issue in this appeal, and the CSPO's terms contain no caveats or exceptions that permit Diebert to come within 500 feet of T.K. and P.K. so long as he does not engage in any intimidating, threatening, or harassing behavior, nor does the CSPO predicate its restrictions on T.K.'s or P.K.'s emotional or mental state.

13.

which a reasonable trier of fact could conclude that Diebert was reckless in failing to depart from T.K. and P.K.'s presence immediately, the jury's verdict was supported by sufficient evidence, and Diebert's first assignment of error is not well-taken.

{¶ 31} In his next assignment of error, Diebert challenges his conviction as against the manifest weight of the evidence. Diebert contends that the weight of the evidence supports that he did not know that T.K. and P.K. were in the vehicle and therefore his short pauses to look at wildlife could not have been reckless. Diebert testified that he saw cat food by the bridge earlier in his walk, he did not look into the SUV as he passed it but merely recorded the license plate number, he had never seen T.K. and P.K. in a vehicle of that color or with that license plate number, and he did not realize that T.K. and P.K. were in the vehicle until P.K. waved at him after he had already crossed the bridge, after which time he walked straight home. Diebert also points to the contradictions regarding the license plate and the vehicle's color in the police report, Officer McBride's testimony, and the cell phone video, arguing that the contradiction demonstrates that he had no idea that T.K. and P.K. were in the nearby parked SUV when he stopped to look at the wildlife.

{¶ 32} Despite these inconsistencies, the jury could have determined that Diebert's testimony that he did not know that T.K. and P.K. were in the vehicle was not credible. Diebert was very familiar with T.K. and P.K.'s habits in feeding the cats near the bridge—as evidenced by his log of their movements and the photo of the cat food he took earlier in his walk—so even if he had never seen the particular vehicle at issue, Diebert

14.

had reason to believe that T.K. and P.K. were inside a vehicle that parked next to the pedestrian bridge. Indeed, Diebert only began taking video of his walk—ensuring that he captured the vehicle's license plate in particular—when he heard the SUV approaching the bridge. Moreover, the jury could have found T.K.'s testimony that Diebert looked inside the vehicle more credible than Diebert's testimony that he did not do so, particularly in light of Diebert's efforts to record the vehicle's license plate and the SUV as he walked away.

{¶ 33} This is not the exceptional case in which the jury clearly lost its way and the evidence weighs heavily against the conviction. Diebert's second assignment of error is not well-taken.

### IV. Conclusion

{¶ 34} For the foregoing reasons, the judgment of the Bowling Green Municipal Court is affirmed. Diebert is ordered to pay the costs of this appeal pursuant to App.R. 24.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.
_____
                                                                  JUDGE

Gene A. Zmuda, J.
_____
                                                                  JUDGE

Charles E. Sulek, P.J.
CONCUR                                                            JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.