[Cite as *State v. Mays*, 2023-Ohio-1908.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-21-1228

    Appellee                                 Trial Court No.  CR0202001502

v.

Mario D. Mays                            **DECISION AND JUDGMENT**

    Appellant                               Decided:  June 2, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Joseph C. Patituce, Catherine Meehan, and Madison Karn, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Mario Mays, appeals the November 19, 2021 judgment of the

Lucas County Court of Common Pleas sentencing him for a fifth-degree felony

conviction of violating a protection order.  For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} Mays was charged with one count of violating a protection order in violation of R.C. 2919.27(A)(1) and (B)(3), a fifth-degree felony, and one count of menacing by stalking in violation of R.C. 2903.211(A)(1) and (B)(2)(e), a fourth-degree felony.[1]

{¶ 3} Mays's case was tried to a jury in October 2021. At trial, the state presented the testimony of C.B., the victim; Christina Baucom, C.B.'s mother; and officer Jeffrey Bodeman of the Toledo Police Department ("TPD"). Mays presented the testimony of Jerri Crisp, the mother of his grandson, and Camari Mays, his son, and testified in his own behalf. The following facts were elicited at trial.

### A. The state's case

{¶ 4} C.B. is Mays's ex-wife. She described their relationship as "back and forth," and said that she moved to get away from him "about once a year" while they were married. She testified that her relationship with Mays was "physical" beginning in late 2004 or early 2005, shortly after their second child was born. In addition to "[t]he name calling and the belittling * * *[,]" C.B. said that Mays's abuse of her included "choking," "doing things" to her in areas that were not visible to most people, "bruises," "twisting [her] arms," "spitting on [her]," and "pushing [her] downstairs [sic]."

{¶ 5} C.B. said that she "filed police reports quite frequently" to report Mays's abuse, but she would "beg them not to notify him, because if he found out [C.B.] was

---

[1] The indictment charged Mays with violating R.C. 2919.27(A)(2). However, after hearing the evidence at trial, the trial court granted the state's motion to amend the indictment to reflect that Mays violated R.C. 2919.27(A)(1).

afraid of what would happen." She did not try to pursue charges against Mays, but filed the reports to "document the incidents * * *."

{¶ 6} C.B. obtained protection orders against Mays in 2007, 2011, and 2017. The 2017 protection order was in effect until June 2022. In September 2017, Mays was convicted in the Toledo Municipal court of a misdemeanor charge of violating the 2017 protection order. Despite the protection orders and conviction, Mays continued to have contact with C.B.

{¶ 7} The indictment alleged that Mays recklessly violated a protection order from November 30, 2019, to February 7, 2020, and C.B. testified to several incidents that happened during that timeframe. The first incident happened on November 30, 2019. That day, C.B. and Mays's son, Camari, and his girlfriend, Crisp, were throwing a birthday party for their son (C.B. and Mays's grandson) at Chuck E. Cheese. C.B. was invited to the party and was told that Mays had also been invited, but he decided not to attend because C.B. was going to be there. However, C.B. said that Mays came to the party and stayed the whole time (approximately two hours). C.B. "didn't want to create a fuss in front of the children about him being there, * * *" so she "let it go." At first, Mays was "nice" and "not aggressive" toward C.B. But after 30 to 45 minutes, Mays saw that C.B. was wearing a ring, grabbed her hand, and asked her if she was married. Although C.B. told Mays that she was not married and it was "just a ring[,]" she said that he "was upset from that point forward."

3.

{¶ 8} Baucom, C.B.'s mother, corroborated much of C.B.'s testimony about the party. She recalled that she and C.B. were sitting at a table across from Mays when "he grabbed [C.B.'s] hand because she had a ring on her finger, and he said, so you married?" After grabbing C.B.'s hand, Mays got up from the table and walked around. Baucom remembered Mays coming to the restaurant after she and C.B. were there and leaving before them. She believed that Mays was at the party for a couple of hours and left right before the end of the party. Baucom did not know at the time of the party that C.B. had a protection order against Mays.

{¶ 9} The state introduced four photographs that C.B. took during the party. C.B. took the pictures because Mays "had started to escalate a little bit before the party * * *[,]" and "[o]nce he saw the ring on [her] finger [she] knew that it would only get worse * * *." In two of the pictures, Mays was standing in the restaurant. She said that he was ten feet away from her in one picture and "[s]everal steps" away from her in the other. In the other two pictures, Mays was sitting at a table with Crisp and her son. When the prosecutor asked how far away Mays was in these photos, C.B. said, "Across the table."

{¶ 10} The second incident that C.B. testified about happened in December 2019. She said that Mays attended their son's Christmas program that she was also at. According to C.B., Mays sat across the church from her and there were no problems between them that day. That month and the next, Mays also called and texted C.B., despite the protection order prohibiting him from contacting her.

4.

{¶ 11} In late January 2020, C.B. decided to report Mays to the police. When she made her report, she told the officers that Mays had a court-ordered visitation schedule with the children in the parties' divorce decree, but that she had not been following the order. Instead, she did whatever Mays told her to do—for example, dropping the children off at his house instead of exchanging them at a police station, letting him pick the children up from school, and allowing the children to stay with Mays overnight— because she "felt that was the safest for * * *" her and it "ke[pt] the arguments down, the threats down." C.B. feared for her life and was afraid that Mays would "yell at the children, blame them * * *" if she did not give into his demands. The officers told her that she "needed to stop immediately" and "needed to follow the Judge's orders." C.B. also showed the officers the phone calls and texts from Mays. On cross-examination, C.B. admitted that she told the officers that Mays was not making threats toward her.

{¶ 12} The final incident that C.B. testified to happened a couple of weeks after C.B. filed her police report. This time, Mays and C.B. had a dispute about the children going to Mays's house for the weekend. The parties' divorce decree did not give Mays any overnight visitation with the children. But, based on a phone call from someone purporting to be Mays's lawyer, C.B. took the children to the exchange location at a police station. C.B. spoke with Bodeman, who was the officer on duty that day. Bodeman testified that he read the divorce decree, and it did not permit Mays to have overnight visitation with the children.

5.

{¶ 13} When Mays arrived at the police station, he tried to get Bodeman to speak to his lawyer on the phone. Bodeman refused because the police had to "abide in [sic] what is in the court paperwork, * * *" and, based on the decree, the children were not allowed to stay the night with Mays. Bodeman said that Mays responded by "getting upset, started screaming, cussing, causing a disturbance in the lobby * * *." Bodeman called in other officers to escort Mays out, but Mays left before the officers arrived. On cross-examination, Bodeman said that it is not unusual for fathers dealing with custody issues to be upset.

{¶ 14} Later that night, C.B. said, one of Mays's family members called her. She recalled that he "told me that I should have listened. I was going to be in big trouble come Monday. I was going to have charges filed against me. I should have listened to the attorney. She was going to get me. And I need to bring the kids on Saturday or else I was going to have consequences that Monday." After this phone call, C.B. relented and took the children to the family member's house so that they could stay with Mays that weekend.

{¶ 15} Following Bodeman's testimony, the state rested.

### B. Mays's case

{¶ 16} After the trial court denied Mays's Crim.R. 29 motion to dismiss, Mays presented the testimony of his witness.

{¶ 17} First were Camari, Mays's son, and Crisp, Camari's girlfriend. They testified that they are in a relationship and have two children together. The couple live in a townhouse that C.B. rents for them, although C.B. does not live there.

{¶ 18} Regarding the incident at Chuck E. Cheese, Crisp said that she invited Mays to the birthday party because he and Crisp's child have "a special bond." She saw Mays come into the restaurant toward the beginning of the party, and said that he went directly to his grandchild (Camari and Crisp's child). Mays stayed with his grandchild and his children. Crisp thought that Mays stayed at the party for 30 to 40 minutes. She said that he "wasn't around [C.B.]" and that Mays and C.B. "didn't have interaction * * *" at the party. She also noted that she "kind of think the situation weird because [C.B.] always wants to associate with [Mays]." Crisp testified that she has good relationships with both Mays and C.B.

{¶ 19} On cross, Crisp admitted that she might not have known if there were issues between two of the adults at her child's first birthday party, and that she had been talking to Mays outside of the courtroom. However, she also testified that C.B. had called her and Camari the night before they testified "saying that she don't think that we should testify against her because she does everything for us."

{¶ 20} Camari largely corroborated Crisp's testimony. He said that he and Crisp had invited Mays to their child's birthday party. Mays came at the beginning of the party, around the same time that Camari arrived. When Camari got into the restaurant, he went to get some tokens, and then he, Crisp, their child, and Mays went to play games.

7.

C.B. was not near them when they were playing games. Camari said that, although C.B. was at the party, he never saw C.B. and Mays together or heard Mays talk to C.B. He thought that Mays was only present for around 30 minutes of the 60-minute party.

{¶ 21} On cross, Camari said that they "really never even sat at the [group's] table most of the time." He claimed that he did not know where his mother was when everyone sang happy birthday to the child, but also admitted that "when we did sing happy birthday my dad was on the whole other side * * *" of the table.

{¶ 22} Mays was the final witness of the trial. The way he recalled the birthday party at Chuck E. Cheese, he arrived around the same time as Camari and some other guests. He said that he immediately went to play games with his son, daughter, and nephews—which he did without taking off his coat or going to the table—and they played for "a long time * * *." He could not recall exactly how long he stayed at the party, but thought that it was in the range of 20 to 45 minutes. He claimed that the first time he saw C.B. at the party was "[w]hen [he] had [his] coat on and [they] actually caught eye to eye contact[, so he] knew it was time to go." He left "probably not even ten minutes" after making eye contact with C.B. He did not know who was around him when the photographs that the state introduced were taken because he did not know who took the pictures or exactly when they were taken.

{¶ 23} Mays's attorney also asked him about some text messages between him and C.B. Mays claimed that his texts to C.B. were always in response to questions she asked him. He said that texting about the children was "the way [C.B.] would deal with [him],"

8.

but that he "never had a communication with her after the divorce except for when she initiates it * * *."

{¶ 24} Regarding the overnight visit incident, Mays's testimony was a bit convoluted, but it seemed like he blamed his family-law attorney for the situation. He said that his attorney "was very upset with" him because he "would not do visitation * * *" if he had to pick up the children at the police station. He "didn't want [his] kids to have that in they head that their dad had to pick them up from the police station." He said that his attorney "felt as though that [he] had to * * *" do visitation exchanges at the police station, which is apparently why Mays went to the station that day. On cross, he said that his attorney "forced [him] to exercise [his] parenting rights * * *" even though he did not feel comfortable exchanging the kids at the police station

{¶ 25} On cross-examination, Mays identified himself in the photographs that C.B. took during the birthday party at Chuck E. Cheese, but he said that he did not know who took the pictures and would not agree with the prosecutor that the person who took them "would have been nearby[.]"

{¶ 26} Mays confirmed that the divorce decree did not permit him to have overnight visits with the children and that exchanges were supposed to happen at the police station. He also claimed that he went to their son's Christmas program because their son was with him that day, so he had to take their son to the program.

{¶ 27} After Mays testified, he rested his case. The jury convicted Mays of violating a protection order and acquitted him of menacing by stalking.

9.

## C. Sentencing and appeal

{¶ 28} Following Mays's conviction, the trial court sentenced him, based on a fifth-degree-felony conviction, to 90 days in jail and three years of community control, which included the condition that Mays have no contact, directly or indirectly, with C.B.

{¶ 29} Mays now appeals, raising three assignments of error:

ASSIGNMENT OF ERROR 1: APPELLANT'S CONVICTION WAS AGINST [sic] THE MANIFEEST [sic] WEIGHT OF THE EVIDENCE.

ASSIGNMENT OF ERROR 2: TRIAL COUNSEL'S PERFORMANCE WAS SO INEFFECTIVE THAT IT AFFECTED THE OUTCOME OF THE TRIAL AND VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS.

ASSIGNMENT OF ERROR 3: THE VERDICT FORM SIGNED BY THE JURY WAS INSUFFICIENT TO CONVCIT [sic] APPELLANT OF A FELONY OF THE FIFTH DEGREE[.]

## II. Law and Analysis

### A. Mays's conviction is not against the manifest weight of the evidence.

{¶ 30} In his first assignment of error, Mays argues that his conviction is against the manifest weight of the evidence because (1) the witnesses presented differing accounts of the events at Chuck E. Cheese; (2) Crisp, Camari, and Mays each testified that Mays did not have any interaction with C.B.; (3) the fact that C.B. and her mother

were the only witnesses who testified to Mays interacting with C.B. was "suspect"; and (4) Mays left the party when he realized that C.B. was there, which is not a violation of the protection order. The state responds that Mays disregarded a substantial risk that C.B. would be at the party; Camari testified that Mays was across the table from C.B. at the party, which was consistent with the state's evidence; and the jury did not clearly lose its way by believing the state's witnesses over Mays's witnesses.

{¶ 31} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 32} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify,

11.

observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 6th Dist. Wood No. WD-07-009, 2008-Ohio-1557, ¶ 62, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 33} To prove that Mays violated R.C. 2919.27(A)(1), the state was required to show that Mays recklessly violated the terms of a protection order issued under R.C. 3113.31. Because the state charged Mays with a fifth-degree felony for violating a protection order, as applicable here, it was also required to show that Mays had previously been convicted of or pleaded guilty to a "violation of a protection order issued * * *" under R.C. 3113.31 or "[o]ne or more violations of [R.C. 2919.27]." R.C. 2919.27(B)(3)(a), (c). A person's conduct is "reckless" when, "with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk * * *" that (1) their conduct is likely to cause a certain result or be of a certain nature, or (2) certain circumstances are likely to exist. R.C. 2901.22(C).

{¶ 34} As relevant here, the protection order against Mays prohibited him from (1) being "within **500 feet** [of] wherever [C.B.] may be found, or any place [Mays] knows or should know [C.B. is] likely to be, **even with [C.B.'s] permission**"; and (2) "**INITIAT[ing] OR HAV[ing] ANY CONTACT** with * * *" C.B. through any type of

12.

written, vocal, or electronic communication, either "in person or through another person * * * **even with the permission of [C.B.]**." (Emphasis sic.) The order accounts for accidental contact between the parties by ordering Mays to "depart *immediately*" if he comes into contact with C.B. "in any public or private place * * *." (Emphasis sic.)

{¶ 35} After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. Mays's primary complaint under his manifest-weight argument is that the jury chose to believe C.B.'s and Baucom's testimony over Mays's, Camari's, and Crisp's. But a conviction is not against the manifest weight of the evidence simply because the jury chose to believe the prosecution's witnesses. *State v. Dean*, 2018-Ohio-1740, 112 N.E.3d 32, ¶ 44 (6th Dist.).

{¶ 36} Further, we cannot say that the jury lost its way or created a manifest miscarriage of justice by believing the state's witnesses about the events at the birthday party, despite Mays's claim that C.B.'s testimony was "suspect" because she did not report Mays to the police until "she had a dispute with [Mays] about their children." First, we note that the part of the trial transcript that Mays cites to support this theory does not indicate that Mays and C.B. had any type of "dispute" before C.B. reported the birthday party incident. In fact, although Mays testified that C.B. apparently did not want one of the children to go on a trip that would require him to miss a week of school, he specifically said that he and C.B. "didn't disagree." And the dispute about the children

13.

staying overnight at Mays's house happened after C.B. made her police report about the birthday party.

{¶ 37} Second, C.B.'s and Baucom's testimony was not the only evidence against Mays, and even without their testimony, the weight of the evidence supports Mays's conviction. Based on Crisp's and Camari's testimony about their relationship with C.B.—i.e., that Crisp and C.B. are "real close" and that C.B. rents the townhouse they live in—it is reasonable to infer that C.B. would be invited to her grandchild's first birthday party. Crisp's testimony that she "begged" Mays to come to the party suggests that Mays knew (or, at the very least, suspected) that he could not be at Chuck E. Cheese during the party because C.B. was going to be there. Camari admitted that Mays was at the table when the party guests sang happy birthday, and, although Camari claimed that he did not know where C.B. was at that time, it is reasonable to infer that C.B.—the birthday child's grandmother—was among the guests who were singing. And Mays himself said that he remained at the restaurant for as long as ten minutes after he realized that C.B. was there. *See Lyndhurst v. Smith*, 8th Dist. Cuyahoga No. 101134, 2015-Ohio-303, ¶ 50-52 (defendant did not "depart immediately" when he remained where the protected person was "after about five minutes * * *"). The photographs that C.B. took at the party—showing Mays on the opposite side of a table that is much narrower than 500 feet—only bolster the jury's finding that Mays recklessly violated the protection order.

14.

{¶ 38} Finally, we also note that the state presented evidence of Mays violating the protection order several times beyond the birthday party. There was evidence that both parties were also present at their child's school event in December 2019, and Mays admitted to texting C.B. numerous times during the period alleged in the indictment. Each instance of contact violated the express terms of the 2017 protection order. Mays's claims that he was at the event because C.B. made sure that he had the child that day and that he only texted C.B. in response to her messages are not defenses under R.C. 2919.27. *See State v. Simms*, 10th Dist. Franklin Nos. 05AP-806 and 05AP-807, 2006-Ohio-2960, ¶ 28 (Appellant's conviction under R.C. 2929.27 was not against the manifest weight of the evidence, despite his claim that he was responding to contact from the victim, because "the protection order does not contain any exception to the order for contact initiated by the victim. The protection order prohibits contact, period. Such circumstances may well mitigate the offense; they do not negate the offense.").

{¶ 39} Based on this evidence, we find that Mays's conviction is supported by the weight of the evidence, and his first assignment of error is not well-taken.

**B. Mays did not show that he was prejudiced by trial counsel's performance.**

{¶ 40} In his second assignment of error, Mays argues that his trial counsel was ineffective because counsel failed to object when the state cross-examined Mays about a prior misdemeanor menacing conviction in violation of Evid.R. 609 and did not stipulate to the existence of Mays's prior conviction for violating a protection order. The state responds that (1) it introduced evidence of the menacing conviction as an element of one

15.

of the offenses that Mays was charged with—not to impeach him—so its introduction did not violate Evid.R. 609, and (2) Mays was not prejudiced by counsel's failure to stipulate to the violating-a-protection-order conviction because the jury would have learned of the conviction regardless of a stipulation and the prosecutor was careful to ask minimal questions about the prior conviction.

{¶ 41} To prevail on a claim of ineffective assistance of counsel, the appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish ineffective assistance of counsel, the appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002), quoting *Strickland* at 694.

{¶ 42} Properly licensed Ohio lawyers are presumed to be competent, *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62, and there are "countless" ways for an attorney to provide effective assistance in a case, so "'[j]udicial scrutiny of counsel's performance must be highly deferential.'" *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689. Counsel is "strongly

presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985), quoting *Strickland* at 694-695. Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of ineffective assistance of counsel. *State v. Grissom*, 6th Dist. Erie No. E-08-008, 2009-Ohio-2603, ¶ 22.

{¶ 43} In this case, Mays cannot show that counsel's performance prejudiced him. First, assuming that counsel's failure to object to the prior menacing conviction fell below an objective standard of reasonable representation, Mays has not shown that there was a reasonable probability that the outcome of his trial would have been different without the admission of that information. Although Mays paints this issue as something that "knee-capped his defense" and "sandbagged [his] credibility[,]" Mays was acquitted of the menacing charge, and, as discussed above, the record contains plenty of other evidence to support his violating-a-protection-order conviction.

{¶ 44} Second, whether to enter a stipulation is generally a matter of strategy, which is outside of the scope of ineffective assistance. *State v. McLaughlin*, 12th Dist. Clinton No. CA2019-02-002, 2020-Ohio-969, ¶ 55; *State v. Hammen*, 5th Dist. Stark No. 2012CA00009, 2012-Ohio-3628, ¶ 16. And, importantly, Mays did not show that the outcome of the trial would have been different if counsel chose to stipulate.

{¶ 45} The fact of Mays's prior violating-a-protection-order conviction was an essential element of fifth-degree felony violating a protection order that the state was

required to prove beyond a reasonable doubt. *State v. Gwen*, 134 Ohio St.3d 284, 2012-Ohio-5046, 982 N.E.2d 626, ¶ 11 (when a prior conviction raises the degree of an offense, the conviction is an essential element of the offense that the state is required to prove beyond a reasonable doubt). Thus, even if trial counsel had stipulated to the conviction, the information would have been presented to the jury, albeit in a slightly different form. *McLaughlin* at ¶ 56, citing *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 153 ("A stipulation would only have relieved the state of its burden of proving the prior conviction element * * *. But because the prior conviction remains an element of the * * * charge, the jury still would have learned that appellant had prior * * * convictions even if trial counsel had stipulated to these prior convictions."); *State v. Wood*, 2d Dist. Clark No. 2016-CA-69, 2018-Ohio-875, ¶ 51 (Trial counsel's failure to stipulate to a prior conviction was not ineffective assistance because "[a] stipulation would have presented the information to the jury in a different way, but the jury would nonetheless have learned of the prior convictions."). Because the information that the jury received would not have changed, there is no reasonable probability that the outcome would have been different with a stipulation.

{¶ 46} Moreover, Mays inflates the role that evidence of the prior conviction played at trial. The record does not show a "continuous presentation of a prejudicial prior conviction * * *" as Mays claims. Instead, the record shows that the state asked C.B. to identify the record of Mays's prior conviction, but did not ask Mays (or any other

18.

witness) any questions about the conviction.[2] The entirety of the testimony about Mays's prior conviction was in this exchange between the prosecutor and C.B.:

[Prosecutor:] I will show you what is marked State's Exhibit Number 1. Take a look at that and tell the jury what it is.

[C.B.:] I believe it is when he violated leaving Family Court. Wait—possibly.

[Prosecutor:] Did you have to go to court after this last violation?

[C.B.:] Yes.

[Prosecutor:] Okay, and was he convicted of violating a protection order in Toledo Municipal Court here in Lucas County, Ohio?

[C.B.:] Yes.

Although both sides mentioned the prior conviction in their closing arguments, neither divulged any details beyond those C.B. provided in her testimony. There were no other mentions of the conviction.

{¶ 47} The information that the jury heard about Mays's conviction was no more than it would have heard if trial counsel had stipulated to the conviction—i.e., someone would have told the jury that Mays's prior conviction existed, and both sides likely would have mentioned it in the same ways in closing. Thus, we cannot say that the outcome of

_____

[2] Mays claims that the state asked him questions about this conviction, but the testimony he points to clearly shows that the questions were about the prior menacing conviction, despite the prosecutor referring to "State's Exhibit Number 1" (the record of the violating-a-protection-order conviction).

19.

the trial would have been different but for trial counsel choosing not to stipulate to the conviction. Accordingly, Mays's second assignment of error is not well-taken.

### C. Mays was properly convicted of a fifth-degree felony.

{¶ 48} In his final assignment of error, Mays argues that the verdict form was insufficient to convict him of a fifth-degree felony because it was "utterly devoid of any reference to the level of the offense or any aggravating factors that determine or raise the level of the offense." The state responds that the inclusion of the Revised Code section elevating the conviction to a fifth-degree felony is sufficient for Mays's felony conviction to stand.

{¶ 49} Under R.C. 2945.75(A)(2), when the presence of an additional element raises the degree of the offense, "[a] guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present." If the verdict does not include this information, the verdict "constitutes a finding of guilty of the least degree of the offense charged." *Id.*

{¶ 50} R.C. 2945.75(A)(2) applies when the charged offense is a higher-level offense because an additional, aggravating element is present. *State v. Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256, 860 N.E.2d 735, ¶ 14; *State v. McDonald*, 137 Ohio St.3d 517, 2013-Ohio-5042, 1 N.E.3d 374, ¶ 17-18. R.C. 2945.75(A)(2) does *not* apply when a statute establishes separate offenses in different subsections (as opposed to establishing a more severe version of a basic offense when additional facts exist); in that case, the *identity* of the offense—as opposed to an *additional element* of the offense—raises the

20.

level of offense and takes the crime outside of the scope of the plain language of R.C. 2945.75(A)(2). *State v. Eafford*, 132 Ohio St.3d 159, 2012-Ohio-2224, 970 N.E.2d 891, ¶ 2, 10, 13-18. In other words, R.C. 2945.75 "applies to different *degree levels* within 'an offense,' not to different offenses altogether." (Emphasis sic.) *State v. Evans*, 2d Dist. Montgomery No. 26574, 2015-Ohio-3161, ¶ 11; *see also State v. Jones*, 9th Dist. Medina No. 17CA0070-M, 2019-Ohio-60, ¶ 22, quoting *State v. Wrage*, 4th Dist. Scioto No. 08CA3237, 2009-Ohio-3390, ¶ 47. ("'R.C. 2945.75(A)(2) and *Pelfrey* apply when additional elements contained within a particular criminal statute enhance the [offense].' * * * They do not apply when, as in this case, the defendant is charged with different mechanisms of committing the same offense or with different offenses altogether.").

{¶ 51} Here, Mays was convicted of violating R.C. 2919.27, entitled "Violating a protection order, consent agreement, or anti-stalking protection order; protection order issued by court of another state." R.C. 2919.27 is not a statute that identifies separate offenses under separate subsections. Rather, it defines the offense of "violating a protection order," in its basic form, as "recklessly violat[ing] the terms of * * *" one of three types of protection orders. R.C. 2919.27(A)(1)-(3). Violating a protection order is generally a first-degree misdemeanor. R.C. 2919.27(B)(2). However, if an additional factual circumstance existed at the time the offender "recklessly violate[d] the terms of * * *" one of the specified types of protection orders, violating a protection order is either a fifth-degree felony under R.C. 2919.27(B)(3), or a third-degree felony under R.C. 2919.27(B)(4). Thus, because the higher-level offense requires the state to prove an

21.

additional element, the statute at issue in this case falls within the ambit of R.C. 2945.75(A). *McDonald* at ¶ 13, citing *Pelfrey* at ¶ 14.

{¶ 52} Under R.C. 2945.75, "a verdict form signed by a jury must include either the degree of the offense of which the defendant is convicted or a statement that an aggravating element has been found to justify convicting a defendant of a greater degree of a criminal offense." *Pelfrey* at ¶ 14. Importantly, "the verdict form itself is the only relevant thing to consider in determining whether the dictates of R.C. 2945.75 have been followed." *McDonald* at ¶ 17.

{¶ 53} Because the sufficiency of a verdict form under R.C. 2945.75(A)(2) is an issue of law, our review is de novo. *State v. Oliver*, 9th Dist. Summit No. 29535, 2021-Ohio-4153, ¶ 14, citing *State v. Brown*, 9th Dist. Summit No. 25206, 2010-Ohio-4863, ¶ 15; *see also Pelfrey* at ¶ 11 (Explaining that "if the meaning of a statute is clear on its face, then it must be applied as it is written." (Internal quotation omitted.)). In other words, the appellant need not demonstrate plain error if R.C. 2945.75(A)(2) applies to his case. *See Pelfrey* at ¶ 5, 14; *compare Eafford* at ¶ 11 (plain error review applies if the charged offense is outside of the scope of R.C. 2945.75(A)(2) and appellant fails to object to the verdict form in the trial court). Mays was charged with an offense that required the state to prove an additional element—i.e., a prior conviction—to raise the degree of the offense from a misdemeanor to a felony. Thus, R.C. 2945.75(A)(2) applies and our review is de novo.

22.

**{¶ 54}** In this case, the verdict form does not verbalize that the crime that Mays was charged with committing—violating a protection order—is a "fifth-degree felony," nor does it verbalize the additional, aggravating element. Instead, the verdict form stated that Mays was charged with "Violating a Protection Order, in violation of R.C. 2919.27(A)(1) and (B)(3)"—which can *only* be a fifth-degree felony. Thus, the relevant issue is whether the verdict form's reference to these two statutory provisions is sufficient to "state * * * the degree of the offense * * *" under R.C. 2945.75(A)(2).

**{¶ 55}** In *State v. Gregory*, 3d Dist. Hardin No. 6-12-02, 2013-Ohio-853, ¶ 24, the Third District concluded that, under *Pelfrey*, R.C. 2945.75(A)(2) *cannot* be satisfied through reference to statutory sections. In that case, the defendant was charged with domestic violence in violation of R.C. 2919.25(A) and (D)(4), a felony of the third degree. Although domestic violence charged under R.C. 2919.25(A) is generally a first-degree misdemeanor, R.C. 2919.25(D)(2), it is a third-degree felony if the jury finds that the defendant "previously has pleaded guilty to or been convicted of two or more offenses of domestic violence * * *." R.C. 2919.25(D)(4). The verdict form in that case stated that the jury found the defendant "*guilty* of the offense of Domestic Violence," and the caption of the form included the specific statutes that elevated the charge to a third-degree felony, R.C. 2919.25(A) and (D)(4). (Emphasis sic.)

**{¶ 56}** The Third District concluded that this verdict form was insufficient because, in *Pelfrey*, the Ohio Supreme Court held that "'[t]he express requirement of [R.C. 2945.75(A)(2)] cannot be fulfilled by demonstrating additional circumstances[.]'"

23.

(First brackets added.) *Id.* at ¶ 24, quoting *Pelfrey* at ¶ 14. In other words, the Third District viewed the statutory references within the verdict form to be "additional circumstances" under *Pelfrey* and, therefore, insufficient under R.C. 2945.75(A)(2).

{¶ 57} The Third District's interpretation, however, is questionable in light of the Ohio Supreme Court's full reasoning and description of "additional circumstances" in *Pelfrey*. There, the Supreme Court determined that a verdict form could not comply with R.C. 2945.75(A)(2) by simply referencing the language of the indictment, and provided the following reasoning:

> Because the language of R.C. 2945.75(A)(2) is clear, this court will not excuse the failure to comply with the statute or uphold Pelfrey's conviction based on additional circumstances such as those present in this case. The express requirement of the statute cannot be fulfilled by demonstrating additional circumstances, such as that the verdict incorporates the language of the indictment, or by presenting evidence to show the presence of the aggravated element at trial or the incorporation of the indictment into the verdict form, or by showing that the defendant failed to raise the issue of the inadequacy of the verdict form.

*Pelfrey* at ¶ 14. In other words, impermissible "additional circumstances" under *Pelfrey* refers to any circumstance that is "additional" because it is *outside the verdict form itself*—e.g., the language of the indictment, jury instructions, trial testimony, or evidence in the record. The *Pelfrey* court did not explicitly or implicitly hold that references to

24.

specific statutory sections within the verdict form cannot "state the degree of the offense" as required by R.C. 2945.75(A)(2).

{¶ 58} Indeed, a few months after the Third District decided *Gregory*, the Ohio Supreme Court decided *McDonald*, which contains a concurring opinion that explicitly states that statutory sections *can* sufficiently state the degree of the offense under R.C. 2945.75(A)(2).

{¶ 59} In *McDonald*, the defendant was charged with willfully failing to comply with the order or signal of a police officer under R.C. 2921.331(B), and the aggravating circumstance of his conduct creating a substantial risk of physical harm under R.C. 2921.331(C)(5)(a)(ii), raising the level of the offense from a misdemeanor to a third-degree felony. *McDonald* at ¶ 4. The verdict form that the jury signed found the defendant guilty of "'Failure to Comply with Order or Signal of Police Officer And Caused A Substantial Risk of Serious Physical Harm To Persons or Property.'" *Id.* at ¶ 20. The defendant argued that the verdict form was insufficient because it did not specifically state that the defendant *willfully* failed to comply—as required under R.C. 2921.331(B), but not R.C. 2921.331(A), a misdemeanor offense—which, the defendant argued, was a necessary predicate for a finding of "substantial risk of physical harm," i.e., the aggravating factor that elevated the crime to a third-degree felony under R.C. 2921.331(C)(5)(a)(ii). The court agreed, and found that the verdict form did not "state that McDonald was guilty of a third-degree felony or set forth the additional elements

25.

that transform the failure to comply with the order or signal of a police officer from a misdemeanor to a third-degree felony." *Id.* at ¶ 19.

{¶ 60} Justice Lanzinger wrote a concurring opinion in which she stated that it was "misleading" for the dissent to suggest that "there is now a requirement for a verdict form to recite each and every element of the offense charged." *Id.* at ¶ 27 (Lanzinger, J., concurring). Justice Lanzinger clarified: "[t]he majority holds simply that the jury's verdict must identify specifically the offense of which the defendant is found guilty: *a reference to R.C. 2921.331(B) and (C)(5)(a)(ii) would have been sufficient*, as would a reference to the degree of the offense as a felony of the third degree. This is a simple application of *State v. Pelfrey* * * *." (Emphasis added.) *Id.* at ¶ 29.

{¶ 61} Indeed, several appellate districts appear to take a similar view that the inclusion of statutory references in a verdict form can satisfy R.C. 2945.75(A)(2). *See State v. Dillard*, 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, ¶ 36-37 ("[T]he Supreme Court of Ohio did not specifically hold in *Pelfrey* or *McDonald* that inclusion of the statutory section of the offense charged in the verdict form would fail to satisfy the requirements of R.C. 2945.75(A)(2)."); *State v. Hughley*, 8th Dist. Cuyahoga No. 90323, 2009-Ohio-3274, ¶ 15-16 (In rejecting an application to reopen, the court determined that appellant's verdict forms were sufficient to convict him of felonies because, by citing the subsection of the statute that appellant was charged with violating, "the jury verdict forms explicitly referenced felony offenses."); *State v. Moore*, 7th Dist. Mahoning No. 12 MA 197, 2013-Ohio-4000, ¶ 20-24 (Finding case law on R.C. 2945.75 "instructive" (although

26.

inapplicable) and determining that verdict form citing the statutory section for a three-year firearm specification—but not the text of the specification—was not deficient because the "statute cited in the verdict form contains the three year firearm specification (and does not contain any other type of specification).").

{¶ 62} We agree, and hold that a verdict form that includes statutory references can comply with R.C. 2945.75(A)(2) if the cited statutory sections—alone, without reference to any "additional circumstances" as described in *Pelfrey*—are sufficient to state the degree of the offense.

{¶ 63} Here, the relevant part of the verdict form says that the jury found Mays "guilty of Count 1, Violating a Protection Order, in violation of R.C. 2919.27(A)(1) *and (B)(3)*." (Emphasis added.) Importantly, the form expressly refers to subsection (B)(3)—the subsection that elevates the offense to a fifth-degree felony. Mays argues that this statutory reference does not comply with R.C. 2945.75(A)(2) because it "does not specify whether the jury made a finding under R.C. 2919.27(B)(3)(a), (B)(3)(b), or (B)(3)(c)." In other words, the verdict form does not say, specifically, which of the alternative factual findings elevated the charge to a fifth-degree felony under R.C. 2919.27(B)(3).

{¶ 64} Although this is true, that level of specificity is not required to satisfy R.C. 2945.75(A). A violation of R.C. 2919.27(A) is a fifth-degree felony if the jury determines that the state proved beyond a reasonable doubt *any one* of the circumstances in (B)(3)(a) to (c). There is no other way to be found guilty of a fifth-degree felony under

27.

R.C. 2919.27, and a finding under (B)(3) does not allow a defendant to be found guilty of any level of violating a protection order other than a fifth-degree felony.  Logically, then, the jury finding Mays "guilty of * * * [a] violation of R.C. 2919.27 * * * (B)(3)"—regardless of whether the jury found that the violation was of (B)(3)(a), (b), or (c)—is sufficient to state the degree of the offense.[3]  In other words, a "violation of R.C. 2919.27(A)(1) and (B)(3)" *is* a fifth-degree felony—it is not merely a "potential" fifth-degree felony, as maintained by the dissent.

{¶ 65} According to the dissent, the verdict form does not comply with R.C. 2945.75(A)(2) because it does not include the specific factual finding that the jury made under R.C. 2919.27(B)(3)(a) to (c), which violates the prohibition against judicial factfinding in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).  But this argument ignores the full language of R.C. 2945.75(A)(2), which provides that the verdict form must "state **either** the degree of the offense of which the offender is found guilty, **or** that such additional element or elements are present." (Emphasis added.)  Moreover, we must remember that the only issue that has been raised in this case is whether the verdict form complied with R.C. 2945.75(A)(2).

---

[3] We note that this would not be the case if, for example, the jury signed a verdict form finding Mays guilty of a "violation of R.C. 2919.27(A)(1) and (B)" because R.C. 2919.27(B) encompasses violations that are first-degree misdemeanors (subsection (B)(2)), fifth-degree felonies (subsection (B)(3)), and third-degree felonies (subsection (B)(4)).  Thus, a mere reference to R.C. 2919.27(B) would be insufficient to state the degree of offense.

28.

{¶ 66} Although the dissent claims that the purpose of R.C. 2945.75(A)(2) is to ensure that the jury, rather than the court, engages in the necessary fact finding, that cannot be the purpose of the statute given that it is satisfied through the mere identification of the "degree of the offense." To that end, there would have been no practical difference if the verdict form had said "we find the defendant, Mario D. Mays (insert guilty/not guilty) _____ of Count 1, Violating a Protection Order, **a fifth-degree felony**" rather than what it did say, which was "we find the defendant, Mario D. Mays (insert guilty/not guilty) _____ of Count 1, Violating a Protection Order, **in violation of R.C. 2929.27(A)(1) and (B)(3)**." (Emphasis added.) While both versions sufficiently state the degree of the offense—thereby satisfying R.C. 2945.75(A)(2)—neither version is sufficient to identify the specific factual finding that elevated the offense to a fifth-degree felony. Importantly, Mays *does not argue* that R.C. 2945.75(A)(2) is unconstitutional as applied to this case because the verdict form—which sufficiently stated the "degree of the offense," thereby satisfying the statute—nonetheless required the trial court to determine which of the alternative, aggravating elements of R.C. 2919.27(B)(3)(a) to (c) had been demonstrated by the evidence.

{¶ 67} Again, the *only* issue raised in this case is whether the verdict form complied with R.C. 2945.75(A)(2). It did. This court must refrain from addressing any issue—especially constitutional issues—that have not been raised, argued, or briefed by the parties themselves.

29.

**{¶ 68}** Finally, we note that R.C. 2945.75(A)(2) does not require the verdict form to verbalize the degree of the offense. Instead, the statute provides that the verdict form "shall *state either* the degree of the offense * * * *or* that such additional element or elements are present." (Emphasis added.) R.C. 2945.75(A)(2). Logically, if a statutory reference can be sufficient to "state" the additional element or elements, then a statutory reference can also be sufficient to "state" the degree of the offense.

**{¶ 69}** Mays's third assignment of error is not well-taken.

**{¶ 70}** Furthermore, we find that our decision is in conflict with the decision in *Gregory*, 3d Dist. Hardin No. 6-12-02, 2013-Ohio-853. In *Gregory*, the Third District determined, based on *Pelfrey* and two earlier Third District cases, that the requirements of R.C. 2945.75(A)(2) could not "be satisfied if the verdict form includes the statutory section under which the defendant was charged." *Id.* at ¶ 24, citing *Pelfrey* at ¶ 14; *State v. Sessler,* 3d Dist. Crawford No. 3-06-23, 2007-Ohio-4931; and *State v. Schwable,* 3d Dist. Henry No. 7-09-03, 2009-Ohio-6523.

**{¶ 71}** Under Section 3(B)(4), Article IV of the Ohio Constitution, "[w]henever the judges of a court of appeals find that a judgment upon which they have agreed is in conflict with a judgment pronounced upon the same question by any other court of appeals of the state, the judges shall certify the record of the case to the supreme court for review and final determination." The Ohio Supreme Court set forth three requirements which must be met in order to certify a case:

30.

First, the certifying court must find that its judgment is in conflict with the judgment of a court of appeals of another district and the asserted conflict must be "upon the same question." Second, the alleged conflict must be on a rule of law-not facts. Third, the journal entry or opinion of the certifying court must clearly set forth that rule of law which the certifying court contends is in conflict with the judgment on the same question by other district courts of appeals.

*Whitelock v. Gilbane Bldg. Co.*, 66 Ohio St.3d 594, 596, 613 N.E.2d 1032 (1993).

**{¶ 72}** Because we find that our decision in this appeal is in conflict with *Gregory*, we certify a conflict to the Supreme Court of Ohio on the following issue: Can the requirement in R.C. 2945.75(A)(2) that a "guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional [aggravating] element or elements are present" be satisfied by a verdict form that cites the statutory sections, permitting the defendant to be convicted of the higher-level offense? The parties are directed to S.Ct.Prac.R. 5.03 and 8.01 for guidance.

### III. Conclusion

**{¶ 73}** For the foregoing reasons, the November 19, 2021 judgment of the Lucas County Court of Common Pleas is affirmed. Mays is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

Gene A. Zmuda, J.
CONCURS, IN PART,
DISSENTS, IN PART, AND
WRITES SEPARATELY.

_____
JUDGE

**ZMUDA, J.**

**{¶ 74}** Although I concur with the majority regarding resolution of the first and second assignments of error, I would find Mays' third assignment of error well-taken, I respectfully concur, in part, and dissent, in part.

**{¶ 75}** In his third assignment of error, Mays argues that the verdict form was insufficient to convict him of a felony of the fifth degree. The jury form does not specify the level of offense as a felony of the fifth degree, and it references an incomplete

32.

statutory section, omitting the subsection that specifies the element the jury must find as establishing the level of offense.

{¶ 76} The state argues that compliance with R.C. 2945.75(A)(2) must be reviewed for plain error, lacking any objection to the sufficiency of the verdict form in the trial court. I agree with the majority's reasoning in rejecting the state's "plain error" argument in favor of application of R.C. 2945.75(A)(2), reviewing compliance with the statute de novo. I disagree, however, with the majority's conclusion that the verdict form, in this case, was sufficient under the statute based on application of the law stated in *State v. McDonald,* 137 Ohio St.3d 517, 2013-Ohio-5042, 1 N.E.3d 374.

{¶ 77} In *McDonald,* the Court cited to *State v. Pelfrey,* 112 Ohio St.3d 422, 2007-Ohio-256, 860 N.E.2d 735 as authority, noting "This court called R.C. 2945.75 'a clear and complete statute' that 'certainly imposes no unreasonable burden on lawyers or trial judges.' It's dictates are simple, and the resolution of cases that do not meet its requirements is also straightforward: 'The statute provides explicitly what must be done by the courts [when R.C. 2945.75(A)(1) is not followed]: the 'guilty verdict constitutes a finding of guilty of the least degree of the offense charged.'" *McDonald* at ¶ 14, quoting *Pelfrey* at ¶ 12-13.

{¶ 78} In *McDonald,* the defendant was charged with violating R.C. 2921.331, failure to comply with the order or signal of a police officer, with the offense elevated to a felony of the third degree pursuant to R.C. 2921.331(C)(5)(a)(ii). The Court held, "To properly convict McDonald of a violation of R.C. 2921.331(B) as enhanced by R.C.

33.

2921.331(C)(5)(a)(ii), the verdict would have to either state that McDonald was guilty of a third-degree felony or set forth the additional elements that transform the failure to comply with the order or signal of a police officer from a misdemeanor to a third-degree felony." *Id.* at ¶ 19. In *McDonald,* because the verdict form did not specify a felony of the third degree, the Court considered whether the verdict form "sufficiently set forth the elements that led to a felony conviction." *Id.* Despite the fact the verdict form included a finding "that McDonald had caused a substantial risk of serious physical harm to persons or property," the Court found this language "superfluous without a finding that the risk occurred when McDonald was in willful flight from a police officer." *Id.* at ¶ 25. In strictly construing R.C. 2945.75(A), the Supreme Court remanded the case for the trial court to enter conviction for failure to comply "as a first-degree misdemeanor." *Id.* at ¶ 26.

{¶ 79} In a dissent, Justice French determined R.C. 2945.75(A)(2) did not require a verdict form to "recite each and every element of the offense charged" and that "there is no constitutional or statutory right to a guilty verdict reciting every element of an offense." *Id.* at ¶ 30-31, French, J., dissenting. In a concurring opinion, Justice Lanzinger characterized this view as "misleading," noting the principle recited in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435(2000) applied, or "that a court may not usurp the fact-finding of a jury through judicial findings." *Id.* at ¶ 27-28, Lanzinger, J., concurring. In agreeing with the majority, the concurrence found

34.

the jury verdict in McDonald's case contained language that would only support the lesser charge, as stated. *Id.* at ¶ 28.

{¶ 80} In *State v. Gibert,* 2017-Ohio-7676, 97 N.E.3d 1004, the First District Court of Appeals applied the law in *Pelfrey* and *McDonald,* finding the Ohio Supreme Court in *McDonald* "made clear" the applicable law, as follows:

> [I]n cases involving offenses for which the addition of an element or elements can elevate the offense to a more serious degree, the verdict form itself is the only relevant thing to consider in determining whether the dictates of R.C. 2945.75 have been followed." *McDonald*, 137 Ohio St.3d 517, 2013-Ohio-5042, 1 N.E.3d 374, at ¶ 17; *[State v.] Johnson*, 2016-Ohio-781, 60 N.E.3d 661, ¶ 13 [(1st Dist.)]. We find *McDonald* and *Johnson* to be controlling in this case. *See State v. Robinson*, 1st Dist. Hamilton No. C-150346, 2016-Ohio-3330, * * * ¶ 29. Therefore, in determining whether the verdict form in this case complied with R.C. 2945.75, we consider only the verdict form[.] *See McDonald* at ¶ 18.

*Gilbert* at ¶ 21. Applying *McDonald,* the First District found "[s]trict compliance with the dictates of R.C. 2945.75 is required." *Gibert* at ¶ 18, citing *McDonald* at ¶ 14; *Johnson* at ¶ 12.

{¶ 81} Based on the facts of this case, and applying the strict compliance standard, it is clear the verdict form, in this case, fails to strictly comply with the dictates of R.C. 2945.75(A)(2). The statute requires a guilty verdict to "state either the degree of the

35.

offense of which the offender is found guilty, or that such additional element or elements are present." The verdict form, here, contains no *statement* of the degree of felony, and as to the additional element, it references only R.C. 2919.27(B)(3), which provides for a *potential* fifth-degree felony should certain unspecified circumstances be met. The section upon which the state relies merely states:

> Violating a protection order is a felony of the fifth degree *if* the offender previously has been convicted of, pleaded guilty to, or been adjudicated a delinquent child for *any of the following*:

R.C. 2919.27(B)(3).

{¶ 82} While the indictment includes language of all three subsections under R.C. 2919.27(B)(3), without specific reference to the subsections, the verdict form specifies neither the subsections nor the actual *element* necessary to elevate the offense to a felony of the fifth degree under any of the three subsections. "R.C. 2945.75 specifically indicates factors that enhance the degree of the offense are 'elements.'" *State v. Rice,* 5th Dist. Delaware No. 20CAA010002, 2021-Ohio-988, ¶ 56, citing *State v. Russell,* 12th Dist. Butler No. CA2012-03-066, 2013-Ohio-1381, ¶ 12, citing *State v. Brooke*, 113 Ohio St.3d 199, 2007-Ohio-1533, 863 N.E.2d 1024, ¶ 8.

{¶ 83} Essentially, the majority argues that the enhancing statute, minus the specific element, denotes the degree of the offense because *all* of the potential enhancing subsections – if found – would lead to a finding for a fifth-degree felony offense. In other words, because R.C. 2919.27(B)(3) provides for a potential felony of the fifth

36.

degree, reference to (B)(3) demonstrates the requisite element to satisfy (B)(3) without actually including the reference to that element, and therefore, satisfies R.C. 2945.75(A)(2). In doing so, the majority cites to *McDonald,* and more specifically, the concurrence in *McDonald.* I disagree, however, that the concurrence provides support, as the facts in this case are distinguishable.

{¶ 84} In *McDonald,* the verdict "was inartfully worded," and without any statutory reference, provided:

> We, the jury, find the Defendant, Scotty R. McDonald (Guilty or Not Guilty) of Count One: Failure to Comply with Order or Signal of Police Officer and Caused a Substantial Risk of Serious Physical Harm to Persons or Property." *McDonald* at ¶ 6; 28, (Lanzinger, J., concurring).

The majority in *McDonald* determined that "'failure to comply with an order or signal of a police officer'" is the name of a violation of either R.C. 2921.331(A) – a general failure to comply with the order of a police officer – or R.C. 2921.331(B) – willful flight in a motor vehicle from a police officer. Only a violation of R.C. 2921.331(B) can be the basis of an enhancement under R.C. 2921.331(C)(5)(a)(ii) for creating a substantial risk of injury or damage to property." *McDonald* at ¶ 20.

{¶ 85} Because the "only path to a felony conviction" is through R.C. 2921.331(B), the majority in *McDonald* determined the "first element of a felony charge under R.C. 2921.331 is that the failure to comply involved willful elusion or flight from a police officer." *Id.* at ¶ 22. The verdict form did not contain this element. *Id.* at ¶ 23.

37.

{¶ 86} The concurrence agreed, but suggested compliance need not require a recitation of the elements. In noting the policy of *Apprendi* and its progeny, the concurrence found that "a reference to R.C. 2921.331(B) and (C)(5)(a)(ii) would have been sufficient, as would a reference to the degree of the offense as a felony of the third degree." *Id.* at ¶ 29, (Lanzinger, J., concurring). These sections provide:

> (B) No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop.

> (5)(a) A violation of division (B) of this section is a felony of the third degree if the jury or judge as trier of fact finds *any of the following* by proof beyond a reasonable doubt:

> (ii) The operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property.

(Emphasis added) R.C. 2921.331(B) and (C)(5)(a)(ii).

{¶ 87} This case differs from the example cited in *McDonald*, in that the verdict form – here – omits the actual element deemed acceptable by the concurrence, ending with the "any of the following" language. As a result, the verdict form does not contain *either a statement* of the level of offense *or statutory reference* to the elements necessary for a fifth-degree felony conviction. R.C. 2919.27(B)(3) refers to three subsections, not contained within the verdict form by reference, requiring a finding to enter a felony

38.

conviction because *all three* subsections – if found – would constitute the felony level charged in the indictment.

{¶ 88} The majority reasons that the verdict form, in this case, contains statutory references that – standing alone – would state the degree of the offense without any additional circumstances. I disagree.

{¶ 89} The statute provides two methods for designating the degree of the offense in the verdict form. Pursuant to R.C. 2945.75(A)(2) a verdict "shall *state* either the degree of the offense * * * or that *such additional element or elements* are present." R.C. 2945.75(A)(2). There is no statement on the verdict form that designates the level of the offense. In order to find such a statement, the majority looks to the second method, the elements, and would construe the statutory subsections as a "statement" of the level of offense, finding an incomplete listing of the elements satisfy the requirement to "state" the degree of offense. I find no direction, within the statute, that permits such a combination of the methods listed in R.C. 2945.75(A)(2).

{¶ 90} As to the elements, the verdict form in this case refers to only *the potential* of a fifth-degree felony, dependent on finding "any of the following," not otherwise listed within the subsection of R.C. 2919.27(B)(3) or within the language recited within the verdict form itself. In the example cited in the concurring opinion of *McDonald,* the statutory reference did not stop with "any of the following," but instead, included the subsection that identified "the following."

39.

{¶ 91} In this case, the verdict form – standing alone – does not contain reference to all the necessary circumstances for a felony conviction. Specifically, the verdict form does not specify which element under R.C. 2919.27(B)(3), found by the jury to enhance the conviction to a felony of the fifth degree. Thus, to enter conviction for a fifth-degree felony, the trial court would need to find one of the elements specified under R.C. 2919.27(B)(3)(a)-(c) had been demonstrated by the evidence. This is precisely the type of judicial fact-finding forbidden by *Apprendi,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435. As noted by Justice Lanzinger, in her concurrence in *McDonald*:

> The United States Supreme Court has clearly held that a court may not usurp the fact-finding of a jury through judicial findings. *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). We have also acknowledged that principle. *State v. Foster,* 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.

*McDonald* at ¶ 28. (Lanzinger, J., concurring).

{¶ 92} Finally, I believe the majority has misconstrued my reference to *Apprendi* as addressing a constitutional issue. While I agree with the majority that courts must refrain from addressing constitutional issues that have not been raised, my dissent does not rest upon a constitutional issue. Rather, the statute in this case is consistent with *Apprendi* in requiring a jury to engage in fact-finding regarding the elements of an

offense.  In other words, *Apprendi* provides the basis for the statute, and the statute must be strictly applied, consistent with *McDonald.*

{¶ 93} Based on the foregoing, I respectfully dissent, in part, as to Mays' third assignment of error, and would reverse and remand for entry of conviction of a first-degree misdemeanor, consistent with *Pelfrey* and *McDonald.*